**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA**

GREGORY WASHINGTON, Ph.D.,     )
                                      )
          Plaintiff,       )
                                      )
vs.                               )     Case No. CIV-06-838-F
                                      )
STATE OF OKLAHOMA ex rel. THE     )
BOARD OF REGENTS OF               )
OKLAHOMA AGRICULTURAL AND     )
MECHANICAL COLLEGES,          )
                                      )
          Defendant.     )

## <u>ORDER</u>

Before the court is the Motion for Summary Judgment, filed by defendant, State of Oklahoma, ex rel. The Board of Regents of Oklahoma Agricultural and Mechanical Colleges ("Board of Regents"), pursuant to Rule 56, Fed. R. Civ. P. Plaintiff, Gregory Washington, Ph.D., has responded in opposition to the motion, and the Board of Regents has replied. Based upon the record, including the following undisputed facts, the court makes its determination.

1.     Langston University ("Langston" or "University") is governed by the Board of Regents.

2.     Dr. Washington has a Master's Degree and a doctorate in philosophy from Stanford University.

3.     Dr. Washington first became employed at the University in 1998 as Director of Rural Business Development. In 2000, he assumed the position of Community Resource Development Specialist.

4.     Marvin Burns is the Dean of the School of Agriculture and Applied Sciences at Langston as well as the Administrator for the Cooperative Extension, Research and Outreach Programs.  He has a doctorate in plant breeding and plant pathology from the University of Arizona and a Master's Degree in agronomy from the University of Washington.

5.     On August 1, 2005, JoAnn Haysbert, Ph.D., became president of the University.  Because she desired "to put in place a new vision and direction for the institution," Deposition of JoAnn Haysbert ("Haysbert Deposition"), p. 16, ll.17-18, she asked the University's senior administrators, including Dr. Burns, to evaluate their employees, their programs and their curriculum.[1]

6.     Dr. Burns believed he was charged with the task of "recommend[ing] [the] non-renewal of individuals whose services, while not necessarily poor, were nonetheless either marginal or unnecessary in nature."  Affidavit of Dr. Marvin Burns, p. 2, ¶ 3.[2]

7.     In response to Dr. Haysbert's request, twenty-five individuals were notified in March 2006 that their employment with the University would terminate as of the last date of their then-current employment contract.

8.     Dr. Burns, aided by Dr. Vernon Jones, Associate Dean for the School of Agriculture and Applied Sciences and interim Associate Administrator for Cooperative Extension/Outreach, reviewed the individuals employed in the Cooperative Extension, Research and Outreach Programs, and recommended that the

---

[1]*See*, Defendant's Response to Interrogatory No. 1, Defendant's Responses to Plaintiff's First Set of Interrogatories ("President Haysbert asked her senior executive officials at Langston . . . to find areas where they could save money by not offering new contracts to employees who weren't really essential.")

[2]The court notes that this document is styled an affidavit but is not notarized.  *See*, 28 U.S.C. § 1746.

2

contracts of six individuals, including the contract of Dr. Washington, not be renewed after June 30, 2006.  The names of the other individuals and their job titles are (a) Theodore Alexander, Small Farm Coordinator, (b) Willie Reynolds, Outreach Specialist, (c) Felicia Cole Williams, Outreach Specialist, (d) Carla Dodd, Administrative Assistant I, and (e) La Shaun Smith, Administrative Specialist.

9.      Alexander, Reynolds and Dr. Washington are black males.  Williams and Smith are black females, and Dodd is a white female.  All are Americans.

10.      Dr. Burns advised Dr. Washington first in a conference attended by Dr. Jones, and then in a memorandum dated March 22, 2006, that his one-year employment contract would not be renewed.

11.      Dr. Washington's duties were given to, and his responsibilities were assumed by, Dr. Linda Tillman, a rural business development specialist employed in the School of Agriculture and Applied Sciences.

12.      Dr. Burns and all other University administrators, save one, who made the employment decisions are African-American.  Dr. Haysbert, Dr. Jones and Dorothy Wilson, 4-H Youth Development, occupy positions superior to Dr. Washington's position on the organization chart for Langston's School of Agriculture and Applied Sciences/Extension-Outreach; they are all African-Americans.

13.      Dr. Washington, at the time his contract was not renewed, was an adjunct professor.  He did not have tenure, and he was not on a tenure track.

14.      Two individuals whose employment with the School of Agricultural and Applied Sciences was not affected are Joshua Kiegeya and Chongo Mundunde. Kiegeya is from Uganda and has a doctorate in extension education from the University of Wisconsin.  Mundunde has a doctorate in demographics and rural development from Michigan State University.

Dr. Washington commenced this action on August 10, 2006. He contends that he has been discriminated against because of his race and national origin in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, *et seq*.

The Board of Regents, in its motion, argues that it is entitled to summary judgment on Dr. Washington's Title VII claims. Summary judgment is appropriate in this case only if "there is no genuine issue as to any material fact and . . . [the Board of Regents] is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. The court at this stage of the litigation does not evaluate the credibility of the witnesses, *e.g*., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), or "weigh the evidence and determine the truth of the matter . . . ." *Id*. at 249. Rather, the court must decide "whether there is a genuine issue for trial . . . [and] there is no [triable] issue . . . unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (citations omitted). The court's inquiry must be whether the evidence, when viewed "through the prism of the substantive evidentiary burden," *id*. at 254, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Because Dr. Washington relies upon circumstantial evidence to prove his Title VII disparate treatment claims, the court applies the framework developed by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to analyze Title VII claims. It is well settled that "McDonnell Douglas and

subsequent decisions have 'established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993)).

Under this burden-shifting framework, Dr. Washington bears the initial burden of establishing a prima facie case of race discrimination and of national origin discrimination. *E.g.*, *id*. (citations omitted). However, because the Board of Regents does not challenge Dr. Washington's ability to make a prima facie showing of race discrimination and of national origin discrimination, the court considers only the two remaining steps in the McDonnell Douglas framework.

At step two, the Board of Regents bears the burden to produce "a legitimate, nondiscriminatory reason," Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981); *e.g.*, Reeves, 530 at 142 (the burden is one of production, not persuasion), for its action. In an attempt to meet its burden, the Board of Regents articulates that Dr. Washington's contract was not renewed because Langston had decided to reduce the number of nonessential employees to save money. The determination of whether the Board of Regents has met its burden "'involve[s] no credibility assessment,'" *id*. (quoting St. Mary's Honor Center, 509 U.S. at 509), and the court finds that the explanation given by the Board of Regents for the adverse employment action in this case qualifies as a legitimate, nondiscriminatory reason.

Accordingly, at step three of the McDonnell Douglas test, the burden of persuasion falls on Dr. Washington to show[3] that Langston intentionally discriminated

---

[3] Of course, plaintiff need not actually "show" or "prove" or "establish" anything to defeat defendant's motion. Plaintiff must merely demonstrate the existence of a genuine issue of material fact. Although this order sometimes uses the quoted terms because they are used in the case law, the court judges plaintiff's claims by the lesser standard which is appropriate at this stage. Goodwin v. General Motors Corporation, 275 F.3d 1005, 1011 at n.7 (10th Cir. 2002) (abrogated on other grounds.).

against him on the illegal basis of race or national origin, and in this connection, Dr. Washington "must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reason[] offered by the . . . [Board of Regents was] . . . not its true reason[], but w[as] a pretext for discrimination.'"  530 U.S. at 143 (quoting Burdine, 450 U.S. at 253) (other citation omitted).

A plaintiff may show pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations and further citation omitted).

Dr. Washington attempts to meet his burden of showing that the reason proffered by the Board of Regents is a pretext for discrimination by relying on the following evidence:

(1)    Langston was in "healthy" financial condition at the time Dr. Haysbert took office as president in August 2005, *see* Haysbert Deposition at p. 16, l. 1;

(2)    Dr. Haysbert has no idea how much money, if any, Langston saved by terminating the employment of Dr. Washington or any other employee in March 2006, *e.g.*, *id.*, p. 28, ll. 22-24;

(3)    Neither Dr. Washington's performance nor his salary was considered when he was selected as an employee whose contract should not be renewed, Deposition of Dr. Marvin Burns at p. 26, ll. 18-19; p. 30, ll. 2-13;

(4)    Dr. Washington's allegedly nonessential duties were given to, and his responsibilities were assumed by, Dr. Linda Tillman;

(5)    Dr. Burns could not recall the reason why Dr. Washington's contract was not renewed and could not recall the reasons Dr. Jones recommended the same;

(6)     the contracts of two non-American-born employees were renewed; and

(7)     Dodd, an Administrative Assistant, and the only white employee whose contract was not renewed in March 2006, was eventually rehired by the Board of Regents.

The court concludes, however, that this evidence is insufficient to create a genuine issue of material fact for trial on the question of pretext.  The fact that Dr. Haysbert testified that Langston's financial condition was "healthy" and that she did not "know the exact dollar figure" saved as a result of the twenty-five terminations does not support a finding that the Board of Regents' reason for Dr. Washington's termination was untrue.  Although Dr. Haysbert testified that Langston was "healthy," she also testified she still wanted to find ways to save money.[4]  Haysbert Deposition, p. 16, ll. 2-4.  While Dr. Haysbert may not have known at her deposition, the exact dollar figure of savings to Langston from the terminations, Dr. Washington has not shown that the terminations did not, in fact, result in a financial savings for Langston. The fact that Dr. Washington's salary and performance were not considered also does not raise a genuine issue of material fact as to whether the Board's reason was false. According to Dr. Burns, Dr. Haysbert had asked her senior executive officials to "find areas where they could save money by not offering new contracts to employees who weren't really essential . . . and challenged [them] to review [their] employee lists and recommend non-renewal of individuals whose services, while not necessarily poor, were nonetheless either marginal or unnecessary in nature."  Affidavit of Dr. Marvin Burns, ¶ 3.  Dr. Haysbert's request to her senior executive officials does not require a consideration of the salaries of employees in recommending non-renewal of their contracts.  Thus, the failure of Dr. Burns to consider Dr. Washington's salary is not

---

[4] Even in "healthy" financial circumstances, it may be taken for granted that money is a scarce resource for Oklahoma's public colleges and universities.

inconsistent with Dr. Haysbert's request.  Dr. Haysbert's request also does not require the consideration of whether Dr. Washington was performing his job satisfactorily. Dr. Burns testified that the non-renewal was not performance based.  Burns Deposition, p. 26, ll. 16-19.  Dr. Burns' memorandum to Dr. Washington advising of his termination states that the "decision in no way should be viewed as a negative reflection upon your past service to Langston University . . . ." *See*, Ex. 1, defendant's response.  The administration was looking for ways to save money by not renewing the contracts of individuals whose services were identified as not being essential to the institution.  Just as plaintiff is not obligated to show that he was a really good employee, the Board of Regents is not obligated, in this context, to show that he was a really bad one.

        To show pretext, Dr. Washington also asserts that Dr. Burns testified that in making his decision, he really did not look to see what employees were essential. According to Dr. Washington, his duties and responsibilities were in fact essential in that they were primarily given to Dr. Linda Tillman to perform.  As to the former assertion, the court concludes that the testimony relied upon by Dr. Washington to argue that Dr. Burns did not look to see what employees were essential does not support the argument.[5]  The cited testimony does not reflect that Dr. Burns, in making

---

[5]  Dr. Burns testified as follows:

> Q.  I've seen in the interrogatories and I believe President Haysbert testified about it, but this distinction between essential and nonessential employees, do you - - was that part of the factors to look at when recommending nonrenewable?
>
> A.  We would look at all employees on the list, and  we would discuss that and a consensus was made and the recommendation came to me and it was my decision to look at it, then make recommendation to the president for nonrenewable.
>
> Q.  Well, did you -- did you sit down and determine which positions were essential and which were nonessential?

his decision, did not consider if an employee was essential or not.  In regard to the latter assertion, while Dr. Burns did testify that some of Dr. Washington's duties and responsibilities were given to Dr. Tillman, there is no evidence that the duties and responsibilities of Dr. Washington required a single, distinct position.  The former duties and responsibilities were divided up and absorbed by Dr. Tillman and perhaps others.  *See*, Burns Deposition, p. 29, ll. 7-25, p. 30, l. 1.  The evidence proffered by Dr. Washington does not suggest that *his* services were, in fact, essential to Langston. The court concludes that the evidence proffered by Dr. Washington does not create an issue of material fact as to pretext.

Dr. Washington also argues that the Board of Regents' decision was pretextual in that two non-American employees (Dr. Joshua Kiegeya and Dr. Chongo Mundunde) were retained even though Dr. Washington was performing his job better than they were.   However, as previously stated, Dr. Burns testified that the recommendation for non-renewal of Dr. Washington was not performance based. Moreover, Dr. Burns, in his affidavit, states, without contradiction by Dr. Washington, that Dr. Kiegeya and Dr. Mundunde have backgrounds which were relevant to the mission of Langston's School of Agriculture and Applied Sciences while Dr. Washington has no such background.   Affidavit of Dr. Marvin Burns, ¶¶ 12, 13. Although Dr. Washington asserts that he was qualified to teach courses like environmental ethics and ethics in agriculture, plaintiff's response, p. 4, Dr. Burns testified that Langston had no such courses.  Burns deposition, p. 43, ll. 15-22, p. 44, ll. 13-16.  As to Dr. Washington's contention that he performed his job better than Dr.

_____

A.  After we looked at the entire list, then we were able to make an assessment of who would not be offered a -- offered a nonrenewable contract.

Burns deposition, p. 17,  ll. 24-25, p. 18, ll. 1-17.

Kiegeya and Dr. Mundunde, the court concludes that such contention does not create a material factual dispute on the issue of pretext. <u>Simms v. Okla., ex rel. Dep't of Mental Health and Substance Abuse Servs.</u>, 165 F.3d 1321, 1329 (10th Cir. 1999); *see also*, <u>Farr v. Seagate Tech., Inc.</u>, 82 F.3d 980, 988 (10th Cir. 1996) ("It is the manager's perception of the employee's that is relevant, not plaintiff's subjective evaluation of his own relative performance.") (citation omitted).

In support of pretext, Dr. Washington also points to evidence that Carla Dodd ("Dodd"), the only white employee who was terminated by Dr. Burns, was rehired by the Board of Regents. The court, however, concludes that such evidence does not create a genuine issue of material fact as to pretext. Dodd was not hired by the Board of Regents to work as an employee of Langston. Instead, she was hired to work as an employee for the Oklahoma State University Department of Transportation. Burns Deposition, p. 22, ll. 8-13. As testified by Dr. Burns, "[Dodd's] paid by Oklahoma State Department of Transportation, but she carries her assignment at Langston University." *Id*. at ll. 16-18. The fact that Dodd may have been hired by the Board of Regents at another university does not show that its reason for terminating Dr. Washington is a pretext for discrimination.

The court additionally concludes that other evidence in the record does not support a finding that the Board of Regents' decision was a pretext for race or national origin discrimination. The Tenth Circuit has concluded that mere conjecture that an explanation advanced by employee is a pretext for race or national origin discrimination is an insufficient basis for denying summary judgment. <u>Anderson v. Coors Brewing Co.</u>, 181 F.3d 1171, 1179 (10th Cir. 1999). A plaintiff must do more than cast superficial doubt on an employer's proffered justification for its decision. Neither Dr. Washington's personal belief that he has been treated wrongfully, unfairly or in a discriminatory manner, *e.g.*, Deposition of Dr. Gregory Washington, p. 50, l.

21, p. 53, l. 19 (the employment of less-qualified non-American born employees was not terminated), nor his personal opinion that the reason given by the Board of Regents is pretextual, *e.g.*, Plaintiff's Response to Interrogatory No. 8, Plaintiff's Response to Defendant's First Set of Interrogatories ("Defendant had no valid reason to terminate his employment"), is evidence of intentional discrimination.  Likewise, Dr. Washington's own assessment of his qualifications, *id.* ("Plaintiff had superior academic qualifications and work-related experiences, received good employment performance appraisals, and also received a recognition of service award, and was not worthy of termination"), does not create a genuine factual dispute.  *E.g.*, Simms, 165 F.3d at 1329; *see* Lucas v. Dover Corp., Norris Division, 857 F.2d 1397, 1403-04 (10th Cir. 1988) (court will not second guess employer's business decisions absent evidence of impermissible motives).

The evidence in the record reflects that those involved in the decision not to renew Dr. Washington's contract were all African-American.  In addition, Dr. Washington, in his complaint, has alleged that Langston is a historically black institution.[6]  *See*, plaintiff's Complaint, ¶ 13.  In his briefing, Dr. Washington proffers evidence that Dr. Haysbert and Dr. Burns, at the time of their decision, were aware of lawsuits against Langston involving Caucasian females alleging race discrimination.  Dr. Washington then surmises that "because Langston was being pressured by white employees about its hiring and firing procedures, it terminated many African-Americans, and more specifically African-American male employees."  *See*, plaintiff's response, p. 8.  The court however finds that Dr. Washington's evidence fails to raise a triable issue as to whether the decision to renew Dr. Washington's contract was based upon or influenced in any way by the lawsuits filed by the

---

[6] This fact may also be judicially noticed.

Caucasian females.  The court concludes that the fact that Dr. Haysbert and Dr. Burns may have been aware of discrimination suits involving Caucasian females does not support a finding that the decision to not renew Dr. Washington's contract was a pretext for race or national origin discrimination.

In his response, Dr. Washington also contends that, even if the evidence does not establish that the Board of Regents intentionally discriminated against him, the evidence does establish the Board of Regents' conduct had a disparate impact upon African-American employees.  The Board of Regents, in reply, objects to Dr. Washington's contention on the basis that he never alleged a disparate impact claim in his complaint, in the parties' joint status report or in responses to discovery.  From a review of the record, it does not appear that Dr. Washington alleged a disparate impact claim.  Nonetheless, in light of the fact that the Board of Regents has addressed the claim and a final pretrial order has not been entered, the court will address the claim.

Disparate impact is an alternate theory for recovery for discrimination. Garrison v. Gambro, Inc., 428 F.3d 933, 939 (10th Cir.  2005) (citing Coe v. Yellow Freight Sys., Inc., 646 F.2d 444, 448 (10th Cir.1981)).  "A disparate impact claim may be established when a plaintiff shows that a facially neutral employment practice falls 'more harshly on one group than another and cannot be justified by business necessity.'"  Id. (quoting Coe, 646 F.2d at 448).  A claim of disparate impact, as opposed to disparate treatment claim, does not require a showing of discriminatory motive or intent.  Santana v. City and County of Denver, 488 F.3d 860, 867 (10th Cir. 2007).

To survive a motion for summary judgment on the disparate impact claim, a plaintiff must carry the burden of making a prima facie case of discrimination.  To make a prima facie case, the plaintiff must show "'a specific identifiable employment

practice or policy caused a significant disparate impact on a protected group.'" Carpenter v. Boeing, 456 F.3d 1183, 1193 (10th Cir. 2006) (quoting Murphy v. Derwinski, 990 F.2d 540, 544 (10th Cir. 1993)).   Assuming arguendo that Dr. Washington has identified an employment practice that he alleges had a disparate impact on African-Americans, the court finds that he has failed to provide sufficient evidence demonstrating such disparate impact.  In support of his case, Dr. Washington merely points out that of the twenty-five employees terminated in all areas of the University, twenty-one were African-American.  See, plaintiff's response, p. 10.  The court, however, concludes that such evidence does not demonstrate a prima facie case. See, Edwards v. Wallace Community College, 49 F.3d 1517, 1520 (11th Cir. 1995) ("[a] plaintiff also must make a comparison of the racial composition of persons in the labor pool qualified for the position at issue with those persons actually holding that position, and he/she must demonstrate that the allegedly discriminatory practice or test is connected to the disparate impact."), see also, Carpenter, 456 F.3d at 1193 ("In other words, a plaintiff must show that there is a legally significant disparity between (a) the [gender] composition, caused by the challenged employment practice, of the pool of those enjoying a job or job benefit; and (b) the [gender] composition of the qualified applicant pool. . .[,i.e.,] the pool from which potential qualified applicants might come." (internal quotations omitted)).  Dr. Washington "must not merely show circumstances raising an inference of discriminatory impact but must demonstrate the discriminatory impact at issue." Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1312 (10th Cir. 1999).   Because the evidence proffered by Dr. Washington is insufficient to establish a prima facie case, the court concludes that summary judgment is appropriate on the disparate impact claim.

Based upon the foregoing, Motion for Summary Judgment, filed by defendant State of Oklahoma, ex rel. The Board of Regents of Oklahoma Agricultural and

Mechanical Colleges, filed on May 1, 2007 (doc. no. 26), is **GRANTED**.  Judgment shall issue forthwith.

ENTERED this 5th day of October, 2007.


STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE


06-0838p007(pub).wpd